**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 05 2012, 8:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PHILIP R. SKODINSKI**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEREMY WHETSTONE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1108-CR-390 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jerome Frese, Judge
Cause Nos. 71D03-0904-FC-88, 71D01-0901-CM-261

**March 5, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Following a jury trial, Appellant-Defendant Jeremy Whetstone challenges his convictions for Class C felony Stalking[1] and Class A misdemeanor Criminal Conversion.[2] Upon appeal, Whetstone challenges his stalking conviction on the grounds that the charging information lacked sufficient specificity. Whetstone additionally contends that certain incriminating statements he made following his arrest were involuntary and should not have been admitted at trial. We affirm.

## FACTS AND PROCEDURAL HISTORY

Whetstone and Julianne Peters were in a volatile dating relationship between 2001 and 2008. In July 2008, Peters broke up with Whetstone. At the time Whetstone had been living with Peters and her mother.

At approximately 4:00 a.m. on September 25, 2008, Whetstone came to Peters's home and knocked on her door. When Peters opened the door, Whetstone hit her face, causing her glasses to fall to the ground. Whetstone took her glasses and left with them. Later that day Whetstone returned the glasses.

In early October 2008, Peters sought an order of protection against Whetstone. The order was granted on October 20, 2008. On November 24, 2008, Peters, who by that point was dating Jeremy Roberts, noticed that the tires on her car had been slashed. Two or three days later, Whetstone called Peters to take credit for having caused the damage. Whetstone also called Peters to ask who was in her driveway, causing Peters to be fearful that Whetstone was watching her.

---

[1] Ind. Code § 35-45-10-5 (2008).

[2] Ind. Code § 35-43-4-3 (2008).

On November 27, 2008, Whetstone and his brother drove to Peters's house, where Whetstone stepped out of his car, waved a BB gun around, jumped back in the car, and drove off. This frightened Peters.

On January 6, 2009, Peters received an apology letter from Whetstone. The letter caused Peters to worry that Whetstone would never stop contacting her.

On January 13, 2009, the State charged Whetstone with Class A misdemeanor criminal conversion based upon the September 25 incident involving Peters's glasses (Count I).[3] On February 6, 2009, the State charged Whetstone with Class A misdemeanor invasion of privacy for the November 27 incident, which occurred in alleged violation of the protective order (Count II). On March 2, 2009, the State charged Whetstone with Class A misdemeanor invasion of privacy for sending the January 6 letter (Count III).

On March 20, 2009, Whetstone contacted Peters, threatening to have her brother, who was already in prison, "put away for twenty years." Tr. p. 79. On March 27, 2009, Peters discovered that her boyfriend Roberts's truck had been spray-painted with the word "STD." This angered Peters.

At some point between January and March of 2009, Whetstone shot at and broke the windows in Roberts's truck. On April 11, 2009, Whetstone called Peters multiple times, telling her that he loved her and that he was sorry, but also that he would kill her. He called her at work on April 17, 2009. The calls upset and frightened Peters.

---

[3] Count I was brought under Cause Number 71D01-0901-CM-261. Counts II and III were brought under separate cause numbers.

South Bend Police Officer Galen Pelletier of the Special Victims Unit was assigned to the case. Upon consulting with a prosecutor, Officer Pelletier concluded that he had probable cause to arrest Whetstone. Officer Pelletier issued a crime information bulletin, which led arresting officers to Whetstone's place of employment. Upon hearing that officers were looking for him, Whetstone contacted and agreed to meet them. At approximately midnight on April 23, 2009, officers arrested Whetstone at the agreed-upon meeting place and took him to jail. During the booking process, Whetstone was informed that his arrest was due to his alleged violation of a restraining order involving Peters. Whetstone, who was placed on suicide watch, was given a smock to wear and placed in a cell with no mattress, sheet, or pillow. Approximately seven hours after his arrest, at around 7:30 that morning, Officer Pelletier met with Whetstone for an interview. Prior to the interview, Officer Pelletier informed Whetstone of his *Miranda* rights, which Whetstone waived. During the interview Whetstone admitted to having violated the protective order and made certain other incriminating statements.

On April 27, 2009, the State charged Whetstone with Class C felony stalking based upon his "repeated or continuing harassment of [] Peters" on or between October 10, 2008, and April 23, 2009, in violation of a protective order (Count V).[4] Appellant's App. p. 12. On June 1, 2009, the State also charged Whetstone with Class A misdemeanor invasion of privacy based upon his April 11 phone call (Count IV).

---

[4] Count V was charged before Count IV. The Cause Numbers for each count are different, with the Cause Number for Count V being 71D03-0904-FC-88.

The case was tried to a jury on March 1-3, 2011. Prior to trial, defense counsel had moved to dismiss the stalking charge on the grounds that it lacked specificity, which motion defense counsel renewed at the beginning of trial. At trial, defense counsel objected to Whetstone's statements made during his interview by Officer Pelletier on the grounds that they were involuntary. The trial court denied the objection. The jury ultimately found Whetstone guilty of Counts I, IV, and V, and acquitted him of the remaining charges. The trial court entered judgment of conviction on Counts I and V after merging Count IV into Count V. The trial court subsequently sentenced Whetstone to concurrent sentences of one year for Count I and six years in the Department of Correction for Count V, with two years executed and four suspended to probation. This appeal follows.

## DISCUSSION AND DECISION

### I. Charging Information

Upon appeal, Whetstone first argues that the charging information for stalking was not adequately specific to inform him of the allegations against him. Count V alleged that Whetstone committed "repeated or continuing harassment" between October 18, 2008, and April 23, 2009, in violation of a protective order. Appellant's App. p. 12.

A charge is subject to dismissal if it does not state the offense charged with sufficient certainty. *Moran v. State*, 477 N.E.2d 100, 103 (Ind. Ct. App. 1985) (quoting Ind. Code § 35-34-1-4(a)(4) and Ind. Const. art. 1 § 13). The accused has the right to require that the allegations contained in the charging instrument state the crimes charged with sufficient certainty to enable him to anticipate the evidence adduced against him at

5

trial, thereby enabling him to marshal evidence in his defense. *Id*. The information must state the crime charged in direct and unmistakable terms. *Id.* at 103-04. Any reasonable doubt as to the crime charged must be resolved in favor of the accused. *Id.* at 104.

In support of his argument, Whetstone points to *Moran* and *Griffin v. State*, 439 N.E.2d 160 (Ind. 1982), wherein this court and the Supreme Court, respectively, found certain charging informations too generic to support their claimed allegations. In *Moran*, the charges at issue alleged failure by a street commissioner to comply with statutory requirements for disposing of public property and awarding public contracts. 477 N.E.2d at 104. But the charges did not specify which of the numerous statutory procedures the commissioner violated, leaving him to speculate, at his peril, as to his particular actions or inactions at issue. *Id.*

In *Griffin*, the defendant was alleged to have received stolen property, yet there was no description of the property at issue or any indication as to the identities of the rightful owners. 439 N.E.2d at 162. According to the *Griffin* court, this lack of specificity failed to inform the defendant of the acts he must defend against, and it placed him at risk of double jeopardy because the court would be unable to tell from the charges whether he had already been tried for having received certain property. *Id.*

Here, in contrast, the acts at issue are easily ascertainable from the charging information. Whetstone was alleged to have violated Peters's order of protection against him. The order identifies only three categories of conduct leading to a violation: (1) threatening to commit or committing an act of domestic violence or a sex offense against Peters; (2) harassing, annoying, telephoning, contacting, or communicating with Peters;

6

and (3) failing to stay away from Peters's residence, school, or place of employment. Even if these limited categories were not specific enough, the probable cause affidavit accompanying the charging information outlined three specific incidents in violation of the protective order: the vandalism of Roberts's vehicle with a gun; the calls to Peters's workplace; and the calls to Peters's cell phone between February 21 and April 11, 2009. Given the limited categories listed in the protective order and the probable cause affidavit specifying the acts at issue, we are unconvinced that Whetstone would be or was left to speculate about the specific nature of the charges against him. The trial court committed no error in refusing to dismiss Count V.

## II.     Admission of Statements

Whetstone next challenges the trial court's admitting into evidence incriminating statements he made to Officer Pelletier during his interview. Whetstone claims that these statements were involuntarily made. The Fourteenth Amendment of the United States Constitution incorporates the Fifth Amendment's privilege against self-incrimination. *Withrow v. Williams*, 507 U.S. 680, 689 (1993). Therefore, to be admissible consistent with those provisions, a suspect's confession must be voluntarily given. *Carter v. State*, 686 N.E.2d 1254, 1258 (Ind. 1997). Under the United States Constitution, the State must prove by a preponderance of the evidence that the defendant's confession was voluntary. *Clark v. State*, 808 N.E.2d 1183, 1191 (Ind. 2004). Under the Indiana Constitution, the State must show voluntariness beyond a reasonable doubt. *Id*.

The voluntariness of a defendant's confession is determined from the totality of the circumstances. *Washington v. State*, 808 N.E.2d 617, 622 (Ind. 2004). In turn, the

"totality of the circumstances" test focuses on the entire interrogation rather than on any single act by police or condition of the suspect. *Id.* We review the record for evidence of inducement by way of violence, threats, promises, or other improper influences. *Id.* The decision whether to admit a defendant's confession is within the discretion of the trial court, and we will not reverse such decision absent an abuse of discretion. *See Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000). Upon reviewing a challenge to the trial court's decision to admit the defendant's confession, we do not reweigh the evidence but instead examine the record for substantial probative evidence of voluntariness. *Id.*

Whetstone first points to the facts that he was arrested pursuant to a criminal information bulletin after voluntarily turning himself in, and that he was never served with an arrest warrant. Whetstone fails to suggest how his warrantless arrest rendered his subsequent statements involuntary. Significantly, Whetstone does not dispute the existence of probable cause justifying his arrest. An officer with probable cause to believe that a felony has occurred may arrest a person with or without a warrant. *See* Ind. Code § 35-33-1-1 (2008) (enumerating the bases for arrest, including the existence of an arrest warrant *or* probable cause to believe the person has committed a felony). We are unable to see how the lack of a warrant in a valid arrest somehow so affected Whetstone's psyche as to render his statements involuntary.

Whetstone also points to his minimal clothing, sparse cell conditions, and claimed lack of sleep in further claiming that his statements were involuntary. While Whetstone might not have spent the most comfortable night in jail, nothing from the record suggests that this affected his awareness or self-determination in any way. Officer Pelletier

8

testified, and the recording of the interview demonstrates, that Whetstone appeared fully cognizant of his actions. Whetstone indicated that he understood the English language, he read aloud the waiver of his rights before he signed it, and he engaged in a relevant and meaningful exchange regarding the waiver at all points leading up to it. To the extent Whetstone claims he was forced into waiving his rights to determine the nature of his case, Whetstone admitted to being aware of the general nature of the charges against him prior to his interview with Officer Pelletier. In any event, we are aware of no authority suggesting that pure curiosity may overtake a defendant's will in this context or that an officer may be held to have somehow violated an arrestee's rights by following the well-established precedent of obtaining the arrestee's waiver of *Miranda* rights before participating in an interview.

The judgment of the trial court is affirmed.

KIRSCH, J., and BARNES, J., concur.